Argued and submitted November 22, 2019, affirmed August 18, 2021

PRINGLE SQUARE, LLC,
an Oregon limited liability company,
*Plaintiff-Respondent,*

*v.*

BERREY FAMILY, LLC,
an Oregon limited liability company;
Dan Berrey, an individual;
Umpqua Bank; and
Michael's Street, LLC,
an Oregon limited liability company,
*Defendants-Respondents,*

*and*

FIRST-CITIZENS BANK & TRUST COMPANY,
a North Carolina corporation,
*Defendant-Appellant.*

Marion County Circuit Court
15CV26456; A168216

497 P3d 1242

Defendant First-Citizens Bank and Trust Company (FCB) appeals from a general judgment declaring that interpleaded funds should be disbursed to defendant, Berrey Family, LLC (Berrey Family). On appeal, among other arguments, FCB asserts that the trial court erred when it determined that the evidence was insufficient to satisfy the doctrine of unclean hands so as to prevent Berrey Family's receipt of the interpleaded funds. FCB also argues that the trial court abused its discretion when it denied FCB's motion to amend its pleadings to conform to the evidence on issues purportedly tried by consent of the parties. *Held*: Because the equitable doctrine of unclean hands did not apply to Berrey Family's legal claim to the interpleader proceeds, the trial court did not err in rejecting the application of the unclean hands doctrine. The trial court did not abuse its discretion when it denied FCB's motion to amend its pleadings to add issues that were not tried by consent.

Affirmed.

Lindsay R. Partridge, Judge.

Teresa H. Pearson argued the cause for appellant. On the briefs were Sanford R. Landress and Miller Nash Graham & Dunn LLP.

Sara Kobak argued the cause for respondents Berrey Family, LLC and Dan Berrey. Also on the briefs were Craig R. Russillo, Jessica A. Schuh, and Schwabe, Williamson & Wyatt, PC.

No appearance for respondents Pringle Square, LLC, Umpqua Bank, and Michael's Street, LLC.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

DeVORE, P. J.

Affirmed.

**DeVORE, P. J.**

This is an action brought by plaintiff, Pringle Square, LLC, (Pringle Square) to resolve competing claims to $407,772.51 through the interpleader process of ORCP 31. Defendant First-Citizens Bank and Trust Company (FCB) appeals from a general judgment declaring that the interpleaded funds should be disbursed to defendant, Berrey Family, LLC (Berrey Family). On appeal, FCB asserts three assignments of error. We reject FCB's first assignment without written discussion.[1] In its second assignment, FCB argues that the trial court erred when it determined that the evidence was insufficient to satisfy the doctrine of unclean hands so as to prevent Berrey Family's receipt of the interpleaded funds. In its third assignment, FCB argues that the trial court abused its discretion when it denied FCB's motion to amend its pleadings to conform to the evidence on issues purportedly tried by consent of the parties. We reject those assignments of error and affirm the judgment of the trial court.

FACTS

We summarize the relevant facts from the trial court's findings and the record at trial. This action has a complicated background that involves a number of interrelated entities, similar names, and unrelated creditors. The complexity of the narrative is unavoidable, is related to FCB's unpleaded allegation of unclean hands, and is necessary to explain denial of the motion to amend.

Pringle Square, the plaintiff, is a property development company formed in 2007. Pringle Square was initially managed by two members, MWIC Pringle Corporation (MWICPC) and Berrey Family. The first managing member, MWICPC, was managed by its sole member, Larry Tokarski, who was also the president and owner of a separate company called Mountain West Investment Corporation

---

[1] In its first assignment, FCB challenges factual findings underlying the trial court's conclusion leading to the disposition of the interpleaded funds. FCB asks that we undertake *de novo* review and make different factual findings leading to a different conclusion. Insofar as the disputed issues are legal rather than equitable, as discussed later, we cannot and, in any event, would not, exercise discretion to try the case anew upon the record.

(MWIC). MWICPC was formed as a holding company and had no employees or bank accounts, and its business was largely conducted through MWIC. The second initial managing member, Berrey Family, was formed as a holding company and its sole member was the Dan and Fran Berrey Living Trust (Berrey Trust). Berrey Trust was managed by two trustees, Dan and Fran Berrey. Berrey Trust did not have its own bank account.

　　　The operating agreement of Pringle Square required that its two general, managing members, MWICPC and Berrey Family, loan Pringle Square equal amounts of money as necessary to meet the financial obligations associated with developing property. Those loans were known as "member development loans." Once Pringle Square successfully developed and sold its property, the operating agreement required that any profits be used to repay all existing loans from the members before any other distributions.

　　　From about 2007 to early 2010, Berrey Family was responsible for actively managing Pringle Square. Berrey Family handled Pringle Square's financial activity and bookkeeping through a property management company. At trial, a bookkeeper from the property management company testified that the company's CPA created categories in the ledger to keep track of incoming funds. The two categories were titled "Loans to/from L. Tokarski" and "Loans to/from D. Berrey." Those bookkeeping labels, rather than reflecting the legal entity names of the managing members, MWICPC and Berrey Family, instead established accounts reflecting the names of the individual associated with each managing entity.

　　　Berrey Family's bookkeeper testified that, in the first few years of Pringle Square's operation, no matter which entity or person actually wrote the check for a loan, the "only thing we cared about was [whether] the money came from Larry or the money came from Dan." The bookkeeper testified that she had never read the operating agreement and that the internal bookkeeping labels were not meant to reflect whether the money was considered a loan from a third party or a member development loan in accordance with the operating agreement. When Pringle Square would

receive checks from MWIC or Dan and Fran Berrey's personal household checking account, the bookkeepers would simply determine whether the check was ultimately associated with "D. Berrey" or "L. Tokarski" and record the loan under the corresponding label. As discussed below, those informal bookkeeping labels later created confusion as to whether Dan Berrey made personal third party loans to Pringle Square, as suggested by the label "D. Berrey," or whether the checks were intended to be member development loans on behalf of Berrey Family.

By early 2010, Berrey Family's involvement in Pringle Square's property development project decreased significantly. MWICPC, through MWIC, took over responsibility for the management of Pringle Square and its finances in early 2010. Berrey Family's bookkeepers transferred Pringle Square's ledgers to MWIC's bookkeeper, and MWIC continued to use the loan tracking labels described above. In December 2010, Berrey Family executed an irrevocable proxy authorization to give all of its voting power to MWICPC and resigned as a managing member. At this point, Berrey Trust remained the owner of any remaining interest that Berrey Family had in Pringle Square, including the distribution rights for repayment of any member development loans as set forth in Pringle Square's operating agreement.

In June 2011, following the failure of other real estate projects, Umpqua Bank (Umpqua) obtained a judgment against Dan Berrey, Fran Berrey, and Berrey Trust for about one million dollars.

About two weeks later, FCB obtained a judgment against Dan Berrey individually, and against Dan and Fran Berrey in their capacities as trustees of Berrey Trust. At the time of trial, the amount owed by Dan Berrey and Berrey Trust on the FCB judgment was $48,143,966.41. In August 2012, FCB obtained a charging order from the Deschutes County Circuit Court (the charging order) charging the membership interests of Dan Berrey and Berrey Trust in Berrey Family. Under the terms of the charging order, Berrey Family was directed to make any payments owed to Berrey Trust or Dan Berrey to FCB.

About two weeks later, Umpqua assigned a portion of its judgment to Michael's Street, LLC (Michael's Street). In September 2012, Michael's Street executed on the judgment and purchased the entirety of Berrey Trust's remaining interest in Berrey Family at the resulting sheriff's execution sale. At that point, Michael's Street became the owner and managing member of Berrey Family. Berrey Trust had no remaining interest in Berrey Family's right to the distribution of profits from Pringle Square in repayment of any member development loans.

In August 2015, Pringle Square sold one of its properties and produced a profit. Pursuant to the distribution plan in the operating agreement, Pringle Square sent a letter to its members stating that the profits from the sale would first be distributed to managers to repay any member development loans received from MWICPC and Berrey Family.

As it prepared to make those distributions, Pringle Square was aware that Berrey Family and Dan Berrey had creditors that may also have had claims for any profits owed to Berrey Family. Because of the ambiguous bookkeeping label of "Loans to/from D. Berrey" and the fact that most of the relevant funds received by Pringle Square were from Dan and Fran Berrey's personal checking account, Pringle Square stated it could not clearly determine whether the funds should be treated as third party, personal loans from Dan Berrey or as member development loans from Berrey Family as a managing member. The uncertainty regarding how the sale proceeds and subsequent profits should be distributed led Pringle Square to file this interpleader action under ORCP 31 in September 2015. Pringle Square named Berrey Family, Dan Berrey, Umpqua, FCB, and Michael's Street as defendants.[2]

With Michael's Street having then-ownership of Berrey Family and its interest in the interpleaded funds, Fran Berrey testified that she and Dan Berrey developed a plan to buy back the entirety of Berrey Family from Michael's

---

[2] In May 2017, Pringle Square would deposit into court two additional sums related to other properties. The several deposits comprised the interpleaded fund of $407,772.51.

Street, in part, to have a potential claim for the interpleaded funds. In October 2015, less than a month after Pringle Square filed this interpleader action, Fran Berrey formed Black Knight, LLC (Black Knight) and was its sole member. Next, Black Knight acquired the interest of another creditor of Berrey Family. With the other creditor's interest, Black Knight—along with Dan Berrey, Fran Berrey, and Berrey Trust—sued Michael's Street, the owner of Berrey Family, to enforce the other creditor's unpaid note against Berrey Family. The parties to the Black Knight lawsuit reached a settlement in January 2017.

As part of the settlement, Black Knight paid sums to Umpqua and Michael's Street to satisfy outstanding claims. Michael's Street assigned its ownership interest in Berrey Family back to Berrey Trust on January 20, 2017. Michael's Street declined to transfer its ownership interest in Berrey Family directly to Black Knight out of concern for possibly violating FCB's judgment or charging order against Berrey Trust and Dan and Fran Berrey in their capacities as trustees. On February 3, 2017, Dan and Fran Berrey, as trustees of Berrey Trust, transferred ownership of Berrey Family from Berrey Trust to Black Knight. At the time of trial, Black Knight owned Berrey Family and Berrey Family's interest in the interpleaded funds.

In August 2016, the trial court granted Pringle Square's motion for interpleader order in part, allowing Pringle Square to deposit the interpleaded funds with the court and discharging Pringle Square from liability as to the interpleaded funds. By the time of trial, only Berrey Family and FCB remained as defendants. Dan Berrey disclaimed any personal interest in the interpleaded funds. Fran Berrey, Berrey Trust, and Black Knight were never parties to this interpleader action.

At trial, the majority of testimony and evidence concerned FCB's argument that Dan Berrey, rather than Berrey Family, had originally loaned the interpleaded funds to Pringle Square. FCB argued that, rather than being treated as member development loans subject to repayment under Pringle Square's operating agreement, the interpleaded

funds should be paid directly to FCB as a creditor of Dan Berrey.

The trial court concluded that the loans came from Berrey Family rather than Dan Berrey. FCB had argued that Dan Berrey had personally loaned the funds to Pringle Square because (1) a majority of the checks were written from Fran and Dan Berrey's personal checking account and (2) the internal bookkeeping methods generally categorized all contributions from Berrey Family related entities and persons as "Loans to/from D. Berrey." The trial court was not persuaded. The trial court determined that "[t]here [was] clear and convincing evidence that all persons or entities who deposited development loans with Pringle Square expected repayment" pursuant to the member development loan repayment provisions of the operating agreement.

FCB also argued that, regardless of the trial court's determination of that issue, the trial court should invoke the doctrine of unclean hands to prevent Berrey Family from receiving any of the interpleaded funds. FCB argued that the sequence of events leading to Black Knight acquiring ownership of Berrey Family amounted to an "asset protection scheme." FCB pointed to evidence that Black Knight's ownership of Berrey Family, as distinguished from Berrey Trust's ownership, was designed to ensure that, if Berrey Family received the interpleaded funds, the funds would not be subject to FCB's charging order. If Berrey Family obtained the interpleaded funds and transferred them to Black Knight, FCB's access to the funds would be defeated, because FCB's judgment was only against Dan Berrey and Berrey Trust. As a consequence, FCB argued that the arrangement meant that Berrey Family and Dan Berrey had entered into the interpleader action with unclean hands by virtue of frustrating a creditor's access to funds.

FCB had failed to plead the unclean hands doctrine, but the trial court considered the evidence of unclean hands on the basis set forth in *Merimac Co. v. Portland Timber*, 259 Or 573, 580, 488 P2d 465 (1971) (discussing that "[i]t is not necessary that the clean hands doctrine be pleaded as a defense, and the trial court * * * may invoke the doctrine on its own motion"). The trial court reasoned that the equitable

doctrine of unclean hands applied to this interpleader action because it considered any declaratory judgment in the context of interpleader to be equitable in nature.

On the merits, however, the trial court rejected the application of the unclean hands doctrine as to the purchase of Berrey Family by Black Knight. Although the court considered the unpleaded contention, the court rejected it due to the scope of the action and the evidence received. The trial court determined that the scope of the interpleader action before the court—determining whether Berrey Family or FCB was the rightful owner of the funds—did not encompass the particular actions challenged by FCB. Whether Dan Berrey, Fran Berrey, or Berrey Trust—who were not parties to the action at the time of trial—engaged in questionable legal maneuvering to defeat FCB's judgment against them was not relevant to determining whether Berrey Family or FCB, as a creditor of Dan Berrey, was entitled to the funds. The trial court clarified that the scope of issues before the court did not concern the purportedly inequitable conduct of nonparties or whether Berrey Trust or Dan Berrey violated FCB's charging order. The court's decision cautioned that it did not address Berrey Family's ability to transfer any funds to Dan Berrey, Fran Berrey, or to the Berrey Trust.

## UNCLEAN HANDS

In its second assignment of error, FCB contends that the trial court erred in failing to be persuaded by the evidence to apply the unclean hands doctrine. FCB asks us to regard interpleader as equitable and to review its second assignment *de novo*. FCB argues that, even if we determine that interpleader is not necessarily equitable, then the substance of Berrey Family's contract claim is equivalent to seeking the equitable remedies of either reformation or specific performance, so as to render the claim equitable in nature.

On the latter point, the trial court determined that Berrey Family's claim to the interpleaded funds could not be characterized as seeking the equitable remedies of reformation or specific performance. But the trial court agreed with FCB that the nature of interpleader was a proceeding in equity. The trial court determined that FCB need

not have pleaded unclean hands, went on to consider the issue, but concluded that the evidence of unclean hands was unpersuasive.

Berrey Family argues that the trial court erred in considering the doctrine of unclean hands in the first instance. Berrey Family argues that, because Berrey Family's claim to the interpleaded funds was based on a contract claim, the proceeding was legal in nature and the equitable doctrine of unclean hands did not apply. Berrey Family explains that its claim to the interpleaded funds is based on the terms of the operating agreement and the intent of the parties as to the origins of the loans. In its view, such a claim does not involve any request for an equitable remedy and is purely legal in nature. In the alternative, Berrey Family argues that, even if the doctrine were applicable, the trial court did not err in determining that the conduct of Fran Berrey, Dan Berrey, Berrey Trust, and Black Knight did not bar Berrey Family's claim to the funds.

To untangle the arguments, we reflect on the nature of interpleader litigation. The interpleader process of ORCP 31 permits a party that is concerned about potential "double or multiple liability" to bring all competing claims before the court and to let the court sort out the competing claims. ORCP 31 A; *Benavente v. Thayer*, 285 Or App 148, 150, 395 P3d 914 (2017). As used by Pringle Square, the rule allows a party to deposit with the court an amount of money for which the party admits it is liable. *Benavente*, 285 Or App at 150. The rule allows the party to obtain both a discharge of liability and an order requiring any parties with interests in the money to resolve their claims through interpleader in the existing action. *Id.*

An interpleader action typically consists of two distinct stages. *See Western Bank v. Morrill*, 245 Or 47, 61, 420 P2d 119 (1966). First, the trial court determines the equitable issue of the plaintiff's right to implead the adverse claimants and to be discharged. *Id.* Second, if interpleader is awarded and the plaintiff is discharged, each defendant must state its own claim to the interpleaded funds. *Id.* The first stage is equitable; the second stage is not necessarily so.

Where the conflicting claims of the claimants involve a declaratory judgment, the second stage of the proceedings can be legal or equitable in nature, depending on the nature of the case and the relief sought. *Ken Leahy Construction, Inc. v. Cascade General, Inc.*, 329 Or 566, 571, 994 P2d 112 (1999). An action is equitable in nature where the relief sought is a declaration of equitable rights and the principles invoked are equitable in nature. *Osborne v. Nottley*, 206 Or App 201, 204-05, 136 P3d 81, *rev den*, 341 Or 579 (2006) (explaining that declaratory judgment proceeding seeking quiet title was equitable in nature). A declaratory judgment claim is legal in nature when it is based on the enforcement of the terms of a contract. *Western Bank*, 245 Or at 62; *Gratreak v. North Pacific Lumber Co.*, 45 Or App 571, 576, 609 P2d 375, *rev den*, 289 Or 373 (1980) (explaining that a party asserting a contract right to perform certain actions is a legal claim).

Without a doubt, the doctrine of unclean hands *is* a matter in equity. Unclean hands is an equitable doctrine that is available to deny equitable relief to a party in a transaction if "that party, relative to the same transaction, is guilty of improper conduct no matter how improper the other party's behavior may have been." *Welsh v. Case*, 180 Or App 370, 385, 43 P3d 445, *rev den*, 334 Or 632 (2002) (internal quotation marks and brackets omitted). As an equitable doctrine, unclean hands applies only to equitable claims and does not apply to claims that are legal in nature, such as contract claims. *Vukanovich v. Kine*, 268 Or App 623, 639 n 10, 342 P3d 1075, *adh'd to as modified on recons*, 271 Or App 133, 349 P3d 567 (2015); *McKinley v. Weidner*, 73 Or App 396, 399, 698 P2d 983 (1985).

In contrast, determining the terms of a loan contract, including the intended payee, is an issue of contract law. *See Investment Service Co. v. Smither*, 276 Or 837, 840-41, 556 P2d 955 (1976) (determining the disputed terms and conditions of an oral loan agreement as a contract issue at law). Oregon subscribes to the objective theory of contract, which provides that the existence and terms of a contract are determined by evidence of the parties' communications and acts. *Rhoades v. Beck*, 260 Or App 569, 572, 320 P3d 593 (2014). If the terms of a contract are ambiguous, the trier

of fact will ascertain the intent of the parties and construe the contract term consistent with the intent of the parties. *Shelter Products, Inc. v. Steelwood Const., Inc.*, 257 Or App 382, 406, 307 P3d 449 (2013).

Berrey Family's claim to the interpleaded funds was based on an assertion that its contract rights under Pringle Square's operating agreement entitled it to be repaid for its member development loans. The operating agreement provided that if Pringle Square's activities produced a profit, the funds would first be distributed to repay all member development loans. Berrey Family argued that this provision controlled the distribution of the interpleaded funds. The primary issue before the trial court—whether the parties to the operating agreement intended the loans to be third party loans from Dan Berrey personally or member development loans from Berrey Family—was part of that contract claim to the interpleaded funds. Evaluating the parties' actions in accordance with written evidence of the parties' intents and actions is not a special equitable remedy, such as reformation or specific performance. It is instead a matter of applying principles of contract law.[3]

The court's consideration of the application of the equitable doctrine of unclean hands was incompatible with the legal nature of Berrey Family's claim to the interpleaded funds. In reaching the merits of the unclean hands contention, the trial court erred. As noted, the trial court rejected the contention as a matter of fact. Ultimately, we reach the same conclusion, albeit for a different reason—that urged by Berrey Family at the outset. That is, as a matter of law, the equitable doctrine did not apply to the legal claim of Berrey Family. We do not reach FCB's evidentiary argument that Black Knight's acquisition of Berrey Family should be persuasive evidence of unclean hands. *See Brewer v. Dept. of Fish and Wildlife,* 167 Or App 173, 180-81, 2 P3d 418 (2000), *rev den*, 334 Or 693 (2002) (an appellate court may affirm a ruling of the trial court on grounds different from those on which the court relied, provided that there was evidence

---

[3] Thus, the trial court correctly determined that Berrey Family's claim to the interpleaded funds could not be characterized as seeking the equitable remedies of reformation or specific performance.

in the record to support the alternative ground); *see also State v. Lovaina-Burmudez*, 257 Or App 1, 14, 303 P3d 988, *rev den*, 354 Or 148 (2013) (no remand for issue presented below if the remand would be gratuitous).[4] Yet, in the end, we do agree with the trial court that the doctrine of unclean hands does not apply so as to forestall Berrey Family's priority to the interpleaded funds.

## AMENDMENT

In its third assignment of error, FCB argues that the trial court abused its discretion by denying FCB's motion, offered under ORCP 23 B, for leave to amend its pleadings to conform to evidence received at trial—a motion that FCB made after the close of evidence. FCB had sought to amend its pleadings to urge the disregard of the corporate form of the three Berrey entities and to seek relief for an alleged fraudulent transfer involving Black Knight. Berrey Family responds that the proposed amendments did not state viable claims for fraudulent transfer or piercing corporate veils. Berrey Family adds that the court did not abuse its discretion because the trial court had ruled before trial that no further amendments would be permitted for either party.

Generally, we review a trial court's ruling on a motion for leave to file an amended complaint for abuse of discretion. *Alexander v. State of Oregon*, 283 Or App 582, 590, 390 P3d 1109 (2017). We uphold the trial court's decision unless it exercises its discretion in a manner that is unjustified by, and clearly against, reason and evidence. *Id.*

In particular, ORCP 23 B requires that an unpleaded issue, which a party urges should be recognized under that rule, must be an "issue" that has been "tried by express or implied consent of the parties." In relevant part, the rule provides:

---

[4] Because this alternate basis to affirm *was* litigated below, this is not an occasion to apply the similar "right for the wrong reason" principle where a potentially dispositive issue was *not* presented below. *See State v. Derby*, 301 Or App 134, 141 n 3, 455 P3d 1009 (2019) (distinguishing *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (articulating a three-factor test to determine whether an issue *not* raised in the trial court is appropriate to be considered for the first time on appeal, and recognizing that, even if it is, we have discretion whether to affirm on that basis)).

> "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment * * *."

ORCP 23 B. When the unpleaded issue is tried by express or implied consent, the pleading is, in effect, deemed to be amended to include that issue. *Ogle v. Nooth*, 365 Or 771, 782, 453 P3d 1274 (2019). However, if the issue has *not* been tried by consent, as demonstrated by objections to the evidence offered for that issue, the pleading is not deemed to have already been amended. *Id.*

Of course, the requesting party may ask that the court grant an ordinary amendment of the pleadings. *See* ORCP 23 A (amending the pleading by leave of the court). Although citing ORCP 23 B, FCB's written motion, accompanied by a proposed second amended answer and cross-claims, implicated the ordinary considerations. When evaluating whether the trial court abused its discretion in denying leave to amend under ORCP 23, we usually consider a non-exclusive list of four factors: (1) the proposed amendment's nature and its relationship to existing pleadings; (2) the prejudice, if any, to the opposing party; (3) the timing of the proposed amendment; and (4) the colorable merit of the proposed amendment. *Ramsey v. Thompson*, 162 Or App 139, 145, 986 P2d 54 (1999), *rev den*, 329 Or 589 (2000).

At the outset, we determine that the pleadings were not deemed amended by operation of law under ORCP 23 B, because the legal issues about fraudulent transfers or disregard of corporate forms were *not* tried by the express or implied consent of both parties. Whether "an unpleaded issue has been tried by implied consent depends on whether the adverse party objected to the admission of evidence *that was clearly directed to the new issue.*" *Ogle*, 365 Or at 788 (emphasis added). FCB offers nothing persuasive to indicate that Berrey Family expressly or implicitly consented to evidence to determine whether fraudulent transfers had occurred or whether to disregard the legal entities of Berrey Family, Berrey Family Trust, and Black Knight. The record

contains indications to the contrary. The evidence on which FCB principally relies to support its amendments—Dan Berrey's testimony regarding financial and accounting practices—addressed the pleaded issue about who had originally loaned the interpleaded funds to Pringle Square. That evidence was not elicited, or offered, by implicit or express agreement of the parties, to address the disregard of the corporate status of Berrey entities. Before trial, Berrey Family filed a motion *in limine* requesting that the court exclude any argument and evidence aimed at asserting a piercing the corporate veil theory, and FCB had responded, in part, that FCB "has not asserted any 'piercing the corporate veil' claim."[5] Likewise, the Black Knight facts addressed the succession of interests to Berrey Family but was not offered, by implicit or express agreement of the parties, for the purpose of trying an issue of fraudulent transfer. As a result, the trial court record provides no basis upon which to assume that FCB's new theories should have been deemed issues tried by agreement of the parties.

Insofar as FCB's motion implicates the customary considerations on amendment, FCB has not shown that the trial court abused its discretion by denying a motion for leave to file an amended complaint. We address the four considerations in turn.

When considering the first factor, we recognize that proposed amendments have a sufficient relationship with existing pleadings where they are "not the product of some unilateral effort by [a party] to interject entirely new claims into the litigation" and are "proffered to cure deficiencies" in the existing pleadings. *Ramsey*, 162 Or App at 147. In this case, however, the amendments involved new claims *and* new parties. The existing pleadings turned on matters of contract and the priorities of competing creditors, whereas claims of fraudulent transfer and disregard of corporate forms turn on issues of misconduct, wrongdoing, and disregard of corporate formalities. *See generally* ORS 95.200 to 95.310 (Uniform Fraudulent Transfer Act); *Amfac Foods v. Int'l Systems*, 294 Or 94, 108-09, 654 P2d

---

[5] FCB insisted, however, that it would argue that the unclean hands doctrine would apply even if not pleaded.

1092 (1982) (some form of improper conduct necessary). The proposed amendments involved contentions, such as Dan Berrey's control of the Berrey entities and Black Knight, that were not expressed in FCB's pleading. And, the amendments involved new parties, such as Fran Berrey and Black Knight, who were never parties to this action and were not mentioned in FCB's prior complaint.

The second and third considerations—prejudice and timing—can be considered together, because FCB's motion came after the close of the evidence. The proposed amendments would have prejudiced the adverse party by surprising Berrey Family, at the close of trial, with two new theories as to which it had not presented defenses. *See id.* (discussing that prejudice could occur where new claims would impair the ability to prepare a defense by requiring new or extensive efforts to address). Ironically, before trial, the trial court denied Berrey Family's motion to amend *its* pleadings, and the trial court warned both parties, after the case had been so long pending, that no additional amendments to the pleadings would be permitted. Necessarily, Berrey Family relied on that understanding that no additional theories would be permitted, and Berrey Family had no reason to have presented evidence directed at rebutting allegations regarding the motive for and facial legitimacy of Berrey Family's ownership structure.

The trial court weighed the fourth consideration—the colorable merits of the amendments—because it had reached the merits of the unclean hands contention, saw similarities, and was unpersuaded. We do not review the merits of the unclean hands contention. It suffices to observe that the colorable merits of the amendments—which would add wholly new theories, involve nonparties, and were offered after the close of evidence—do not serve to show an abuse of discretion in denying FCB's motion to amend its pleadings. Taken together, the usual considerations confirm that the trial court did not abuse its discretion when denying amendment.

## CONCLUSION

We conclude that the trial court did not err in rejecting the application of the unclean hands doctrine to Berrey

Family's legal claim to the interpleader proceeds, and the trial court did not abuse its discretion when it denied FCB's motion to amend its pleadings to add issues that were not tried by consent. Accordingly, we affirm.

Affirmed.